NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0517n.06

No. 18-2229

**FILED**
Oct 11, 2019
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| JODY STAMP, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:  ROGERS, WHITE, and READLER, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Defendant Jody Stamp pleaded guilty to one count of Possession of an Unregistered Firearm, in violation of 26 U.S.C. § 5861(d), and was sentenced to 60 months' imprisonment.  Stamp appeals, arguing that his sentence is procedurally and substantively unreasonable.  Stamp also raises an ineffective assistance of counsel claim, which we decline to reach on direct appeal.  Because Stamp's sentence is reasonable, we **AFFIRM**.

**BACKGROUND**

In the early morning of November 30, 2017, Stamp and his mother, Maryland Stamp, were asleep at their home in Portage, Michigan, when someone knocked loudly on their front door. Maryland looked out her bedroom window and was shot three times by an unknown perpetrator from outside the home.  When law enforcement arrived at the Stamp house, they found Stamp holding his mother, who was on the floor and bleeding.  Law enforcement described Stamp as distraught and "reluctant to move" away from his mother.  R. 33, PID 83.  When Stamp moved,

law enforcement provided first aid to Maryland, who was then transported to a hospital for further treatment. Fortunately, Maryland survived.

At the time of the shooting, Stamp was on parole for state offenses and was wearing a tether, so he could not go in the ambulance with his mother. While Maryland was at the hospital receiving treatment, a family friend called Stamp and told him that he knew "who killed grandma." R. 44, PID 209. At that point, Stamp believed his mother had died. Stamp then cut off his tether and joined the friend in a borrowed vehicle, hoping to "catch up to" the people who shot his mother. *Id.* at PID 210.

Around 5:00 a.m., law enforcement learned that Stamp had cut off his tether. When law enforcement called Stamp, he told them that he planned to "take care of this problem himself." R. 33, PID 84. Later that morning, law enforcement located Stamp and the family friend in the borrowed vehicle at a gas station. Stamp was in the driver's seat. After arresting Stamp and the friend, law enforcement found two shotguns, ammunition, and a nearly empty bottle of whiskey in the car. They also found ammunition in Stamp's pocket. Stamp later reported that he drank nearly a full bottle of whiskey that morning and was heavily intoxicated at the time of his arrest.

A federal grand jury issued a two-count indictment charging Stamp with one count of being a Felon in Possession of a Firearm and Ammunition and one count of Possession of an Unregistered Firearm. Stamp pleaded guilty to the latter charge.

Based on a criminal history category of V and an adjusted offense level of 19, the probation officer recommended a sentence at the top of the 57-71 months Guidelines range. In the presentence investigation report, the probation officer reported that Stamp had a long criminal history that included twenty-three prior convictions. However, only three were assigned criminal history points. The probation officer identified USSG § 4A1.3, Criminal History Adequacy, as a

2

potential ground for an upward departure because Stamp "has been continuously involved in the criminal justice system" and "has numerous violations while being supervised on probation and parole." R. 33, PID 112. The probation officer also described Stamp's mental-health and substance-abuse histories, including his diagnoses of Bipolar Disorder, Intermittent Explosive Disorder, and Attention Deficit Hyperactive Disorder. Although Stamp was prescribed medications for these disorders, he stopped using them. When interviewed, Stamp stated that his diagnosis of Intermittent Explosive Disorder "makes sense to him . . . looking back on his life history" and that to combat his disorder, he tries to "think about his actions[] before reacting." *Id.* at PID 108. He also acknowledged a history of anger-management issues. Stamp self-reported a history of alcohol abuse, but stated he had been sober from 2002 until the day of his arrest in November 2017.

Stamp's attorney moved for a downward variance based on the nature and circumstances of the offense pursuant to 18 U.S.C. § 3553 (a)(1), arguing that the shooting of Maryland Stamp was a catalyst for Stamp's crime and a mitigating circumstance. At the sentencing hearing, the court asked Stamp's attorney to describe Intermittent Explosive Disorder, noting that "it's sort of self-descriptive, probably." R. 43, PID 170. Stamp's attorney explained that Stamp "has difficulty coping when under a lot of stress" and reiterated that "but for the fact that shots rang out and his mother was injured he would not be here." *Id.* at PID 170, 174. The sentencing court also reviewed Stamp's prior convictions and parole violations and stated that the total criminal history score "hardly reflects his criminal history." *Id.* at PID 165.

When given an opportunity to speak, Stamp expressed regret and took responsibility for his actions, stating, "I don't blame [my friend] for why I'm here because I seen them guns in the back of that car. I didn't have to get in there. I did not." *Id.* at PID 178. The court responded:

> But the critical and the crucial issue in your explanation here is when he said let's go get 'em and in essence, and I don't know if you used the word, but you said, yes, let's go get 'em. And you get the guns. Can you imagine . . . the blood bath that you could have going in with two shotguns and two guys in Kalamazoo, Michigan and trying to take revenge on people? You were not thinking very clearly, were you?

*Id.* Stamp replied:

> My mind wasn't right, your Honor. . . . I don't even know what my intentions were. . . . I ain't drank in two years and I drank that thing straight down, sitting in a parking lot, crying my eyes out. I thought my mom had passed, you know. She is my best friend.

*Id.*

The district court sentenced Stamp to 60 months' imprisonment. The court recognized that the circumstances were "tragic" for Stamp, but found that after "go[ing] over the nature of the offense and [Stamp's] background" and "listen[ing] to everybody," a within-Guidelines sentence was appropriate. *Id.* at PID 185. In stating its reasons for the sentence, the court repeated its assessment that Stamp's "criminal history is a little bit understated." *Id.* The court also noted its concern with "the bipolar situation and his intermittent explosive disorder, which is not an excuse for crimes, and certainly makes him more dangerous rather than less." *Id.* at PID 186.

On appeal, Stamp challenges his sentence as procedurally and substantively unreasonable. He also argues that his trial counsel was ineffective at sentencing.

## DISCUSSION

### I.    Procedural and Substantive Reasonableness

"A criminal sentence must be both procedurally and substantively reasonable." *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019). Procedural reasonableness is process-driven. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018). It requires the sentencing

court to "properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Substantive reasonableness, on the other hand, focuses on whether a "sentence is too long (if a defendant appeals) or too short (if the government appeals). The point is not that the district court failed to consider a factor or considered an inappropriate factor . . . , [but] that the court placed too much weight on some of the § 3553(a) factors and too little on others." *Id.* at 442.

We review procedural and substantive unreasonableness claims for an abuse of discretion, although we review the sentencing court's factual findings for clear error and its legal conclusions de novo. *Parrish*, 915 F.3d at 1047.

## A.    Procedural Reasonableness

Stamp argues that the district court's determination that Stamp's mental illnesses made him more—rather than less—dangerous is not supported by the record.[1] Stamp asserts that because the district court did not have access to expert opinions or a psychological report on his disorders, its finding was based on speculation.

The district court did not clearly err in finding that Stamp's mental disorders make him more dangerous, rather than less. According to the presentence investigation report, Stamp acknowledged a history of anger-management issues and suggested that his Intermittent Explosive

---

[1] Stamp did not raise this objection at sentencing. Ordinarily, a party who fails to object at sentencing forfeits his opportunity to raise new procedural unreasonableness objections on appeal. *United States v. Bostic*, 371 F.3d 865, 873 (6th Cir. 2004). However, where a district court fails to ask the parties to raise their objections after announcing the sentence but before the sentencing hearing is adjourned, the parties do not forfeit their objections and are not required to demonstrate plain error on appeal. *Id.* at 872. The district court failed to ask the *Bostic* question during Stamp's sentencing hearing. Thus, Stamp did not forfeit his right to raise new objections and is not required to demonstrate plain error.

Disorder makes it difficult for him to consider his actions before reacting. At the sentencing hearing, Stamp's counsel stated that Stamp's disorder causes him to have "difficulty coping when under a lot of stress." R. 43, PID 170. Stamp's counsel also connected Stamp's difficulty coping under stress with his past criminal conduct, including the conduct underlying this case. On this record, it was not unreasonable for the district court to find that Stamp's mental disorders enhance the risk of dangerous behavior. Although, as Stamp argues, it may have been beneficial for the district court to have access to psychological reports and evaluations regarding Stamp's mental disorders before sentencing, the absence of such reports does not undermine an otherwise sound finding.

To the extent Stamp argues that it was impermissible for the district court to consider his mental health an aggravating (rather than mitigating) factor, that argument also fails. To be sure, "[e]vidence of a criminal defendant's significant mental illness, whether occurring before or after sentencing, is . . . relevant to crafting a just sentence under § 3553(a)." *United States v. Robinson*, 778 F.3d 515, 523 (6th Cir. 2015). But there is no obligation to treat a defendant's mental illness as mitigating. To the contrary, a sentencing judge must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). The district court was within its discretion to reason, based on the record before it, that Stamp's mental disorders make him more likely to engage in dangerous behaviors. *See also United States v. Maxwell*, 483 F. App'x 233, 237 n.2 (6th Cir. 2012) ("[A] defendant's history of mental health problems and bizarre behavior may be viewed as aggravating, not mitigating factors . . . .").

### B. Substantive Reasonableness

This court applies a presumption of reasonableness to within-Guidelines sentences. *United States v. Vonner*, 516 F.3d 382, 389-90 (6th Cir. 2008) (en banc). Although the presumption is rebuttable, "[a] defendant who challenges a within-Guidelines sentence bears no small burden." *United States v. Massey*, 663 F.3d 852, 861 (6th Cir. 2011) (internal quotation marks and citation omitted).

Stamp has not rebutted the presumption of reasonableness. Stamp argues that the district court placed too much weight on his criminal history and on "what could have happened instead of what actually happened,"[2] Reply Br. at 3, and not enough weight on the tragic nature of the circumstances precipitating Stamp's crime, including how his mental disorders may have influenced his decision making. The record shows, however, that the district court "listened to everybody" and considered that Stamp's situation was "tough" and "tragic." R. 43, PID 185-86. The court weighed these circumstances against the potential for violence underlying the offense and its determination that Stamp's "criminal history is a little bit understated." *Id.* at PID 185. After considering all the § 3553(a) sentencing factors, the district court reasonably concluded that, notwithstanding the tragic circumstances surrounding the crime, a sentence near the bottom of the Guideline range was appropriate given the need for deterrence, Stamp's demonstrated risk of

---

[2] Stamp relies on *United States v. Van*, where this court held that a district court's sentence was substantively unreasonable because it was based on speculation that the defendant was participating in a criminal scheme. 541 F. App'x 592, 598 (6th Cir. 2013). *Van* is inapposite. There, the district court found that the defendant was involved in a criminal scheme based on its inkling that there was "something more going on," and admitted that the facts supporting the finding were "beyond the knowledge of the court." *Id.* (internal quotation marks omitted). Here, the district court properly considered Stamp's motive in processing the guns. The court's assessment was not based on speculation; Stamp and his counsel repeatedly conveyed that he intended to use the firearm to take revenge on those that he believed shot his mother. Further, the district court's findings with respect to Stamp's mental disorders were supported by Stamp, Stamp's counsel, and the presentence investigation report.

recidivism, and Stamp's purpose in possessing the unregistered firearm. Accordingly, we cannot say that Stamp's sentence is substantively unreasonable.

## II.    Ineffective Assistance of Counsel

Stamp argues that his trial counsel's "failure to present psychological reports, records, or testimony for mitigation purposes" constituted ineffective assistance of counsel. Appellant's Br. at 17. Stamp asserts that presentation of evidence concerning how his mental disorders influenced his actions would have "create[d] a reasonable possibility that the outcome of his sentencing would [have] be[en] different." *Id.* at 18.

We ordinarily do not review ineffective assistance of counsel claims on direct appeal because the record is usually insufficient to permit adequate review. *United States v. Gardner*, 417 F.3d 541, 545 (6th Cir. 2005); *see also United States v. Ross*, 206 F.3d 896, 900 (6th Cir. 2000) ("Such claims normally should be raised in habeas corpus proceedings, which permit counsel to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted." (internal quotation marks and citation omitted)). However, when the record is adequately developed to allow us to assess the merits of the issue, we will do so. *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000). Here, the record does not permit an adequate review of Stamp's claim. It is not clear whether or to what extent Stamp's trial counsel considered presenting psychological reports, records, or expert testimony on Stamp's mental disorders. Nor is it apparent that presentation of such evidence would have been helpful to Stamp. We therefore decline to address the issue of ineffective assistance of counsel on direct appeal.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.